**UNITED STATES, Appellee,**

v.

**Jerry L. GIPSON, Boiler Technician Second Class U.S. Navy, Appellant.**

No. 48,376.
NMCM 83 1514.

U.S. Court of Military Appeals.

July 13, 1987.

For Appellant: *Lieutenant Donald F. O'Connor, JAGC, USNR* (argued); *Lieutenant Commander William A. DeCicco, JAGC, USN* (on brief); *Lieutenant Commander Frederick N. Ottie, JAGC, USN.*

For Appellee: *Lieutenant W.A. Durling, JAGC, USNR* (argued); *Captain W.J. Hughes, JAGC, USN, Lieutenant J.K. Ianno, JAGC, USNR* (on brief); *Commander Michael P. Green* and *Lieutenant Joseph J. Portuondo, JAGC, USNR.*

*Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Captain Andrew D. Stewart, Captain John F. Burnette* (on brief)—for Government Appellate Division, USA.

*Colonel William G. Eckhardt* and *Captain Donna Chapin Maizel* (on brief); *Major Joel D. Miller* and *Captain William J. Kilgallin*—for Defense Appellate Division, USA.

*Lesley Anne Fair* (argued); *Steven H. Goldblatt, Esq.,* and *Martha J. Tomich* (on brief); *Kelly Signs*—for Georgetown University Law Center, Appellate Litigation Clinic.

*Charles F. Marino, Esq.* (argued)—for American Polygraph Association.

*Colonel Kenneth R. Rengert, Colonel Andrew J. Adams, Jr., Major Robert E. Ferencik, Jr.* (on brief); *Lieutenant Colonel Robert E. Giovagnoni*—for Appellate Government Division, USAF.

*Homer A. Walkup, Esq.* (argued); *John D. Fauntleroy, Esq., Sterling Johnson, Jr., Esq., Michael E. Barber, Esq.* (on brief)—for Judge Advocates Association.

### Opinion of the Court

COX, Judge:

The basic issue in this case is whether the results of a polygraph examination are inadmissible in a court-martial as a matter of law.[1] We conclude that they are not.

### Facts

At trial, appellant made an *in limine* motion to admit evidence of an "exculpatory" polygraph examination. Apparently, appellant had secured this examination at his own initiative and expense. The proffer was that a competent operator had conducted a proper examination and asked appellant the germane questions; further, the examiner's conclusion was that appellant was truthful in denying commission of the charged offenses.

The prosecution offered to stipulate to the polygrapher's expertise but opposed "any defense attempt to lay a foundation to show that polygraph examinations are and should be accepted as evidence in a trial by court-martial" on the grounds "that case law ... points out that such evidence is not reliable at this—at least has not been shown to be reliable and scientifically acceptable." In addition, trial

counsel announced that a Naval Investigative Service (NIS) polygrapher also had examined appellant and concluded that he was deceptive in answering the relevant questions in the negative.

Thereupon, the judge ruled that neither party would be permitted "to lay a foundation or to admit the evidence with respect to the polygraph examination." The judge reasoned that

> this field has not been developed that well, or accepted that well [i]n the scientific community or the judicial community for that matter, to be admissible, and it, more or less, takes that function from the fact finder, especially in light of the fact we have a defense, apparent exculpatory—a so called exculpatory examination, and one by the government which is, more or less, inculpatory.

Defense counsel then pointed out that his expert had asked very specific questions relating to whether appellant had possessed or sold drugs aboard ship to the named individuals and on the particular dates in question, while the government examiner had asked very broad questions, such as whether appellant had *ever* possessed or sold drugs aboard the ship.[2] Finally, defense counsel proffered that he was prepared to lay the foundation for admissibility through the testimony of his polygrapher. These representations did not induce the judge to reverse his ruling.

Without benefit of the testimony, appellant was convicted, contrary to his pleas, of three specifications each of possession, transfer, and sale of lysergic acid diethylamide (LSD), arising from three discrete drug episodes.[3] The Government's evi-

1. The granted issue is:
   WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN NOT ALLOWING THE DEFENSE AN OPPORTUNITY TO LAY A PROPER FOUNDATION FOR THE ADMISSION OF THE RESULTS OF APPELLANT'S POLYGRAPH EXAMINATION INTO EVIDENCE.

2. The Government has never denied defense counsel's assertions, repeated in this appeal, and indeed they are confirmed by the reports of the

respective polygraphers which are attached to this record as appellate exhibits.

3. The military judge advised the members that each of the three sale-transfer-possession episodes was multiplicious for sentencing purposes. Appellant was sentenced to a bad-conduct discharge, confinement for 4 years, forfeiture of $350.00 pay per month for 48 months, and reduction to E-1. The convening authority approved the sentence. Subsequently, the convening authority suspended *all* punishment ex-

dence consisted chiefly of the testimony of two servicemembers that they had purchased the drugs from appellant. One of these servicemembers claimed to have been involved in all three transactions; the other only claimed involvement in the last one. Both of them had served as NIS "sources" on other occasions. In addition, laboratory reports and chain-of-custody documents pertaining to the drugs were introduced in evidence.

The defense evidence consisted essentially of attacks on the motives and credibility of the "sources"; of testimony that the alleged transactions would have been difficult, if not impossible, to accomplish in the manner described by the "sources"; and of appellant's testimony that he did not engage in the charged conduct.

### The Polygraph

Few subjects in the law have generated as much controversy as the polygraph. The machines are designed to measure several involuntary physiological responses, such as respiration, galvanic skin response, blood volume, and pulse rate. The theory is that the examinee's fear of being detected in a lie will cause such responses as will permit the operator to distinguish truth from deception.

Criticism of the underlying theory is not lacking. First, it is noted that the machine only records physiological responses, not lies. Since it is argued that emotions other than fear of detection can cause similar physiological responses, the ability to identify truth or deception is disputed. Further, the theory assumes that different people will respond to the same stimuli in essentially the same way—a proposition stoutly contested.

Moreover, critics cite a host of external factors that may skew results. For example, since the operator purports to be able to infer truth or deception from physiological responses, gauging his skill and the objectivity of this technique is paramount.

In addition, communications between examiner and examinee are critical. Therefore, the precision of the questions is important, as is the ability of the examinee to understand them in just the way the examiner intended them. These factors may depend on the education, intelligence, and cultural backgrounds of both examiner and examinee. Further, since the examinee's fear of detection is the supposed *sine qua non* of the procedure, his state of mind is crucial. Did he care? Could he care? Was he worried about being detected in a lie? Was some other emotion at play? Finally, were there other conditions, such as medications, drugs, or attempted countermeasures, that rendered the examinee unsuitable for the examination?

Proponents of the technique counter that skilled operators can detect and screen out unsuitable candidates. Further, they argue that proper procedures will minimize the potentially distorting factors to a substantial degree. *See generally* L. Taylor, *Scientific Interrogation* 193–246 (1984) (hereafter Taylor); P. Giannelli and E. Imwinkelried, *Scientific Evidence* 231–73 (1986) (hereafter Giannelli).

### Reliability

Theory apart, there have been numerous studies on the reliability of the polygraph technique, and we certainly do not claim mastery of the field. *See* Appendix for a partial list. On the surface, however, there seems to emerge more agreement on the reliability aspect than on the soundness of the underlying principles. To be sure, all credible studies and authorities readily concede significant rates of error. But the consensus of the experts seems to be that, under the best of conditions, and especially in the criminal context, competent operators can identify truth and deception at rates significantly better than chance, i.e., 50 percent. Of course, opinions vary on how much better than chance the results can be, with higher figures tending to come

cept for confinement already served, which amounted to approximately 7 1/2 months at

that point.

from polygraph industry studies and lower figures from the scientific-medical community.

To be sure, a number of the studies suggest that, when polygraph operators err, they have a greater tendency to identify "false positives." *E.g.*, Raskin, *Science, Competence, and Polygraph Techniques*, 8 Criminal Defense 11, 15 (1981). This means that they are more likely to label a truthful subject a liar than *vice versa*. The implication is that negative results, such as appellant's, might be more reliable than positive ones, such as the Government's.

On the other hand, some experts question the validity of *ex parte* examinations, such as appellant's. Since the theory of the polygraph is predicated on the supposition that fear of detection will cause responses, *ex parte* examinations may be invalid because "[t]he suspect, aware that the results would be discarded if the findings indicated that he was untruthful, has little to fear." Taylor, *supra* at 216. Perhaps it is for this very reason, *i.e.*, to ensure that the examinee's feet are put to the fire, that the majority of jurisdictions admitting polygraph results do so when the parties stipulate—prospectively—that the results will be admissible at trial. *See generally* Giannelli, *supra* at 9, 248–54. *Cf. United States v. Beck*, 729 F.2d 1329, 1332 (11th Cir.), *cert. denied*, 469 U.S. 981, 105 S.Ct. 383, 83 L.Ed.2d 318 (1984); *United States v. Feldman*, 711 F.2d 758, 767 (7th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983).

But the most troublesome aspect of the question of reliability is the wide range of uses which are apparently being made of the polygraph in private business, industry, and the federal government.[4] If the tests are not reliable, why are they being used so heavily? Are they merely some type of "hocus-pocus" used to create an atmosphere which induces the guilty to confess, or do they really provide scientific evidence from which an examiner may ferret out truth? The greater weight of authority indicates that it can be a helpful scientific tool.

### Classes of Scientific Evidence

Scientific evidence can be divided into three levels. At the top, the principles underlying the expertise are so judicially recognized that it is unnecessary to reestablish those principles in each and every case. In effect, the validity of these sciences and techniques are judicially noticeable; and into this group fall "fingerprint, ballistics, or x-ray evidence." *United States v. Downing*, 753 F.2d 1224, 1234 (3d Cir. 1985). At the bottom lies a junk pile of contraptions, practices, techniques, etc., that have been so universally discredited that a trial judge may safely decline even to consider them, as a matter of law. To that level have been relegated such enterprises as phrenology, astrology, and voodoo. In the middle is that range of scientific and technical endeavor that can neither be accepted nor rejected out of hand. To this group, based on the information available to us, we assign the polygraph.

4. *Use of Polygraphs as "Lie Detectors" by the Federal Government: Hearings Before a Subcomm. of the House Comm. on Government Operations*, 88th Cong., 2d Sess. (1964); *The Use of Polygraphs and Similar Devices by Federal Agencies: Hearings Before a Subcomm. of the House Comm. on Government Operations*, 93d Cong., 2d Sess. (1974); *The Use of Polygraphs and Similar Devices by Federal Agencies: 13th Report by the House Comm. on Government Operations*, 94th Cong., 2d Sess. (1976); *Use of Polygraph Tests by the U.S. Department of Defense: Hearing Before the Subcomm. on Civil & Constitutional Rights of the House Comm. on the Judiciary*, 97th Cong., 2d Sess. (1982); *Review of the President's National Security Decision Directive 84 and the Proposed Department of Defense Directive on Polygraph Use: Hearing Before a Subcomm. of the House Comm. on Government Operations*, 98th Cong., 1st Sess. (1983); *Presidential Directive on the Use of Polygraphs and Prepublication Review: Hearings Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 98th Cong., 1st & 2nd Sess. (1983 & 1984); *Polygraphs in the Workplace: The Use of "Lie Detectors" in Hiring and Firing: Hearings Before the Subcomm. on Employment Opportunities of the House Comm. on Education and Labor*, 99th Cong., 1st Sess. (1985).

## Standards of Admissibility: The Frye Test

The first case to reject the admissibility of polygraph results was *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).[5] Of greater importance than the outcome in *Frye* was the test established for all emerging scientific evidence. Under this approach, the proponent had to establish as a foundation that the evidence was of a type generally accepted in the scientific community. This test quickly became the standard for evaluating novel scientific evidence in most American jurisdictions. As the polygraph never achieved this general acceptance, its admissibility was severely restricted. Even now, "in the vast majority of jurisdictions ... the results of an unstipulated polygraph test are inadmissible [as] evidence at trial." Taylor, *supra* at 253; *see also* Giannelli, *supra* at 244.

Like most jurisdictions, the military embraced *Frye. See United States v. Hulen*, 3 M.J 275, 276 (C.M.A. 1977); *United States v. Ford*, 4 U.S.C.M.A. 611, 16 C.M.R. 185 (1954). In addition, paragraph 142e, Manual for Courts-Martial, United States, 1969 (Revised edition), provided:

> The conclusions based upon or graphically represented by a polygraph test ... are inadmissible in evidence in a trial by court-martial.

At least in part, this ban apparently stemmed from concerns that factfinders would place undue reliance on experts' conclusions. *See United States v. Ledlow*, 11 U.S.C.M.A. 659, 663, 29 C.M.R. 475, 479 (1960). No doubt, misgivings about reliability, as well as the fair-trial implications of the prosecution's use of "dubious" evidence, also played a role.

## Standards of Admissibility: The Federal & Military Rules of Evidence

Over the years, the *Frye* test came under increasing criticism. *See* Giannelli, *supra* at 25–28. The chief complaint was that too much good evidence went by the boards during the "lag time" inherent in the scientific "nose-counting" process. Imwinkelried, *The Standard for Admitting Scientific Evidence: A Critique from the Perspective of Juror Psychology*, 100 Mil.L. Rev. 99, 103–04 (1983) (hereafter Imwinkelried). In 1975, the Federal Rules of Evidence were enacted. Neither the rules nor the advisory committee notes mention *Frye*. Further, nothing in the rules looks remotely like the *Frye* test. *See* Imwinkelried, *supra* at 105. The commentators are divided over the meaning of this omission. *Compare* 1 D. Louisell & C. Mueller, *Federal Evidence* 818 (1977); M. Graham, *Handbook of Federal Evidence* § 703.2 (1981); and S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 633 (4th ed. 1986), *with* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* para. 702[03] (1985) (hereafter Weinstein); and C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5169, p. 92 (1977).

The courts also are split. Some courts adhere to *Frye. E.g., Brown v. Darcy*, 783 F.2d 1389, 1394–95 (9th Cir. 1986); *United States v. Hunter*, 672 F.2d 815, 817 (10th Cir. 1982); *United States v. Alexander*, 526 F.2d 161, 164 (8th Cir. 1975). Others go the opposite way, concluding outright that *Frye* is no longer the "independent controlling standard of admissibility." *United States v. Downing*, 753 F.2d at 1237; *see also United States v. Williams*, 583 F.2d 1194, 1197–98 (2d Cir. 1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); *United States v. Dorfman*, 532 F.Supp. 1118, 1134 (N.D. Ill. 1981), *aff'd.*, 737 F.2d 594, 611 (7th Cir. 1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Still other courts leave the matter to the discretion of the trial court. *E.g., United States v. Falsia*, 724 F.2d 1339, 1341 (9th Cir. 1983).

The Military Rules of Evidence, patterned after the federal rules, came into effect in 1980.[6] Like the advisors of the

---

5. The machine used in *Frye* was a crude precursor of the present-day machine.

6. *See* Chapter XXVII, Manual for Courts-Martial, United States, 1969 (Revised edition)(Ch. 3), and

federal rules, the drafters of the military rules did not indicate whether *Frye* survives. The drafters did allow that Mil.R. Evid. 702 (Testimony by experts) "may be broader and *may* supersede *Frye v. United States.*" Drafters' Analysis, A18–93, Manual for Courts-Martial, United States, 1969 (Revised edition). Four military rules are pertinent.

Mil.R.Evid. 402, like its federal counterpart, proclaims: "All relevant evidence is admissible." Exceptions are made for conflicts with the federal Constitution, the Uniform Code of Military Justice, other Acts of Congress, the Military Rules of Evidence, and the remainder of the Manual for Courts-Martial. Irrelevant evidence is, of course, expressly not admissible.

Mil.R.Evid. 401 defines "Relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This is also known as "logical relevance," a standard that is not high. *McCormick on Evidence* 542–43 (E. Cleary, 3d ed. 1984)(hereafter McCormick); *cf. United States v. Elliot*, 23 M.J. 1, 8 (C.M.A. 1986); *United States v. Dorsey*, 16 M.J. 1, 6 (C.M.A. 1983).

Mil.R.Evid. 403 admonishes the military judge to exclude even relevant evidence

> if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The sum of Mil.R.Evid. 401–03 is sometimes called legal relevance. *McCormick, supra* at 548.

For expert testimony, a further limitation is provided. Mil.R.Evid. 702 permits testimony "in the form of an opinion or otherwise" "[i]f ... [it] will assist the trier of fact to understand the evidence or to determine a fact in issue." Deciding

whether testimony will be helpful involves a balancing of

> (1) the soundness and reliability of the process or technique used in generating the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse, or mislead the jury, and (3) the proffered connection between the scientific research or test result to be presented, and particular disputed factual issues in the case.

*United States v. Downing*, 753 F.2d at 1237 (footnote omitted).

Taken together, the rules seem to describe a comprehensive scheme for processing expert testimony. Such a scheme is within the President's authority to promulgate rules of evidence for courts-martial. Art. 36(a), 10 U.S.C.A. § 836(a). We therefore agree that *Frye* has been superseded and "should be rejected as an independent controlling standard of admissibility." 753 F.2d at 1233–37; *see* Imwinkelried; *supra.* Indeed, we have already recognized that the thrust of the new rules is to make more expert testimony available to the factfinders than previously. *United States v. Snipes*, 18 M.J. 172, 178 (C.M.A. 1984); *see United States v. Mustafa*, 22 M.J. 165, 167–68 (C.M.A.), *cert. denied,* —— U.S. ——, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986). Our conclusion is in line with that policy.

For any type of evidence to have logical relevance, however—scientific evidence included—some degree of reliability is implicit. 753 F.2d at 1238. In addition, the helpfulness standard of Fed.R.Evid. 702 is said to "impl[y] a quantum of reliability beyond that required to meet a standard of bare logical relevance." *Id.* at 1235. Without *Frye*, how is a judge to know whether scientific evidence has a tendency to prove a fact or will assist the factfinder? "Ordinarily ... the answer must lie in the judge's own experience, his general knowledge, and his understanding of human conduct and motivation." *McCormick, supra* at 544. In other words, the judge has considerable room to exercise "judgment."

Part III, Manual for Courts-Martial, United States, 1984.

■ What tools may the judge use in evaluating probativeness and helpfulness? Ironically, one of the most useful tools is that very degree of acceptance in the scientific community we just rejected as the be-all-end-all standard. 753 F.2d at 1238. The point is, general acceptance is a factor that may or may not persuade; it is not the test. Other factors may now be equally persuasive. *Id.* at 1238–39; Weinstein, *supra* at para. 702[03].

### Constitutional Arguments

There is an argument that accused persons have a constitutional right to present exculpatory evidence. This theory is derived from two Supreme Court decisions. In *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the accused had been precluded, under a "voucher" rule, from cross-examining his own witness. The witness had confessed to the crime with which Chambers had been charged, and the prosecution failed to call him as a witness. Chambers also was not allowed to introduce evidence of the witness' confessions. Under the circumstances, the Supreme Court found a due process denial of a fair trial. In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the accused was not allowed to call as a witness his alleged co-participant in the crime. The witness previously had been convicted of the crime. State statutes in effect at the time of trial barred a participant-accused from testifying for a co-participant but not from testifying for the prosecution. The Supreme Court found a compulsory process violation.

■ A few courts have experimented with the notion that an accused has an independent, constitutional right to present favorable polygraph evidence.[7] We do not subscribe to this theory of admissibility because there can be no right to present evidence—however much it purports to exonerate an accused—unless it is shown to be relevant and helpful. When evidence meets these criteria, no additional justification for admissibility is necessary. Mil.R. Evid. 401 and 402.

Due process may have an impact in two respects, however: First, in deciding whether defense evidence satisfies the relevance and helpfulness standards; second, in deciding whether the probative value of the evidence is outweighed by extraneous factors (Mil.R.Evid. 403). Perhaps in these areas, judges should bend even further than normal in the direction of giving the accused the benefit of the doubt.

This is not to suggest that admissibility of polygraph evidence is a one-way street. If polygraph evidence can be relevant and helpful for the defense, it can be for the prosecution as well. Arguably, as indicated, there may be a rational basis for distinguishing between positive and negative results. But if negative defense results can be admissible, negative government results can be too. This could occur, for example, where a government witness had passed a polygraph. If anything, in marginal cases, due process might make the road a tad wider on the defense's side than on the Government's.

### Permissible Use of Polygraph Evidence

■ Assuming a judge decides to admit the results of a given polygraph, how can they be used at trial? First and foremost, while polygraph evidence relates to the credibility of a certain statement, it does not relate to the declarant's character.[8] At

---

**7.** *See* P. Giannelli and E. Imwinkelried, *Scientific Evidence* 257 (1986).

**8.** For this reason, we reject the Government's alternate contention that Mil.R.Evid. 608(a)(2) and (b) bar use of polygraph evidence. Mil.R. Evid. 608(a)(2) allows admission of "evidence of truthful character ... only after the character of the witness for truthfulness has been attacked." As the Government points out, appellant's char-

acter was not attacked. However, since the rule addresses character evidence, and polygraph evidence is not character evidence, the rule is inapposite. A like result disposes of the Government's Mil.R.Evid. 608(b) argument. That rule generally prohibits use of "extrinsic evidence," "other than conviction of crime," to prove "[s]pecific instances of conduct of a witness, for the purpose of attacking or supporting the credibility of the witness." Evidence of such

best, the expert can opine whether the examinee was being truthful or deceptive in making a particular assertion *at the time of the polygraph exam*. It is then for the factfinder to decide whether to draw an inference regarding the truthfulness of the examinee's *trial* testimony.[9] *Cf. Commonwealth v. Vitello*, 376 Mass. 426, 381 N.E.2d 582, 597–98 (1978). Theoretically, it is conceivable that an expert's opinion about the truthfulness of a statement made during a polygraph exam could even support a direct inference as to guilt or innocence.[10] However, we would not condone such opinion testimony absent the examinee's consistent testimony. If it were otherwise, the conclusions of the expert concerning the credibility of the declarant would be the only evidence presented to the factfinder. In this circumstance, we really would be concerned about usurpation of the factfinder's role.[11]

### Conclusions

■ In our assessment, the state of the polygraph technique is such that, depending on the competence of the examiner, the suitability of the examinee, the nature of the particular testing process employed, and such other factors as may arise, the results of a particular examination may be as good as or better than a good deal of expert and lay evidence that is routinely and uncritically received in criminal trials. Further, it is not clear that such evidence invariably will be so collateral, confusing, time-consuming, prejudicial, etc., as to require exclusion. If anything is clear, it is that the battle over polygraph reliability will continue to rage. Therefore, we do not purport to establish our conclusions as immutable principles. Rather, until the balance of opinion shifts decisively in one direction or the other, the latest developments in support of or in opposition to particular evidence should be marshaled at the trial level.

In addition, we do not suggest that all polygraph evidence is admissible or that this particular evidence should have been admitted.[12] Appellant still bears the burden of establishing the foundational predicates outlined above. Our holding here is only that appellant was entitled to attempt to lay that foundation.

The decision of the United States Navy-Marine Corps Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Navy

conduct (usually misconduct) is adduced for the inferences that might be drawn about the witness' character for credibility. Again, since polygraph results do not reveal character, they are not barred by the rule.

9. This presents the polygraph operator as something of a credibility medium, a role with which we admittedly have had difficulty in the past. *Compare United States v. Snipes*, 18 M.J. 172, 179 (C.M.A. 1984) (Cook, J., Opinion of the Court), *with* 180 (Everett, C.J., concurring in the result). How helpful for the factfinders such media are is for the proponent to demonstrate and the judge to resolve.

10. This assumes that the statement of the declarant is not offered for the truth of the matter asserted but as a basis for the polygrapher's testimony. Mil.R.Evid. 703 and 801(c).

11. One fear we do not have is that factfinders will be overwhelmed by polygraph testimony. The concern commonly expressed in that regard is that factfinders will place undue reliance on the myth of scientific infallibility, thereby deferring their historic function to the experts. A number of recent studies refute that contention, and their authors conclude that juries generally are capable of evaluating polygraph evidence and giving it due weight. *See* Imwinkelried, *The Standard for Admitting Scientific Evidence: A Critique from the Perspective of Juror Psychology*, 100 Mil.L.Rev. 99, 114–15 (1983). For our part, we have elsewhere expressed our confidence in court-martial panels. *E.g., United States v. Garwood*, 20 M.J 148 (C.M.A. 1985). Assuming polygraph testimony is admitted at a court-martial, it would appear humane to give the factfinder some idea of the approximate range of accuracy that qualified operators might be expected to attain. That way they can attempt to evaluate the weight to be given the testimony in light of their estimation of the level of competence of the particular expert.

12. Because appellant here made himself available to be polygraphed by a government expert, this record presents us no occasion to discuss whether a judge could properly deny admission of defense-proffered polygraph evidence on the grounds that the accused failed to "cooperate" and submit to a government-sponsored polygraph examination. *Cf.* Mil.R.Evid. 302(d).

for transmission to an appropriate general court-martial convening authority for reference to a general court-martial military judge for the purpose of conducting an evidentiary hearing. At this hearing, the judge will take evidence and rule on the defense motion. If the judge rules in favor of admission of the evidence, he will set aside the findings of guilty and the sentence. He will then refer the matter to the convening authority, who may order a rehearing or, if he deems a rehearing impracticable, may dismiss the charges. If the judge rules against admission of the evidence, then an authenticated, verbatim record of the limited rehearing will be transmitted directly to this Court.

## APPENDIX

A partial list includes.

1. *Scientific Validity of Polygraph Testing: A Research Review and Evaluation—A Technical Memorandum,* U.S. Congress, Office of Technology Assessment, OTA–TM–H–15, 1983, *reprinted in* 12 Polygraph 196 (1983).

2. Department of Defense, *The Accuracy and Utility of Polygraph Testing* (1984), *reprinted in* 13 Polygraph 1 (1984).

3. Waid & Orne, *The Physiological Detection of Deception,* 70 American Scientist 402 (1982).

4. Horvath, *The Effect of Selected Variables on Interpretation of Polygraph Records,* 62 J. Applied Psychology 127 (1977).

5. Horvath & Reid, *The Reliability of Polygraph Examiner Diagnosis of Truth and Deception,* 62 J.Crim.Law, Criminology & Police Sci. 276 (1971).

6. Gallup Organization, *Survey of Members of the Society for Psychological Research Concerning Their Opinion of Polygraph Test Interpretation,* 13 Polygraph 153 (1984).

7. Kleinmuntz & Szucko, *On the Fallibility of Lie Detection,* 17 Law and Society Review 84 (1982).

8. Kleinmuntz & Szucko, *Is the Lie Detector Valid?,* 9 Criminal Defense 21 (1982).

9. Council Report, *Polygraph,* 256 Journal of the American Medical Assn. 1172 (Sept. 5, 1986).

EVERETT, Chief Judge (concurring):

As I interpret the principal opinion, it seeks to provide a military judge some discretion to admit evidence that might be excluded under a mechanical application of the test announced in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). Although in my view the *Frye* test has been useful, I am persuaded that a slight relaxation of it is now in order.

Sometimes it takes decades for the scientific community to reach general agreement on the reliability of certain principles or techniques. Indeed, agreement may never be obtained. For example, millions of persons use the services of chiropractors, who receive extensive training in anatomy and physiology; but many physicians and surgeons would dispute the scientific basis for their method of healing. Acupuncture has existed for centuries, perhaps millenia; but the principles which underlie its use are still unclear. From the time of Freud, schools of psychiatry have come and gone.

Although the "bright line" *Frye* test provides greater certainty for a judge in coping with the pluralism in scientific thought and the conflicts among experts, the price paid for that certainty has become too great. Instead, the military judge should have some freedom to admit expert testimony and let the opponent bring to the factfinder's attention, by cross-examination or extrinsic evidence, the criticisms and the lack of acceptance of the principles on which the expert has relied.

Certainly, at a time when polygraphs are widely used in both the public and private sectors, when large amounts are expended for polygraph operators and equipment, and when vital decisions involving national security are predicated on lie-detector re-

sults,[1] I cannot justify requiring a judge to reject *all* polygraph evidence, regardless of the circumstances. Indeed, I am unsure that this result is dictated even by *Frye*, because in many respects the acceptance of polygraph results already has become "general."

In determining admissibility of polygraph evidence the judge should heed carefully the principal opinion's observation that "one of the most useful tools is" the "degree of acceptance in the scientific community." 24 M.J. at 252. At the very least, the expert witness should be able to relate his theories to scientific principles having a substantial body of adherents. *Cf. United States v. Mustafa*, 22 M.J. 165 (C.M.A.), *cert. denied,* — U.S. ——, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986). Obviously, the training, experience, and skill of the polygraph operator must be taken into account by the judge. Also, I believe that he should consider whether the results being offered in evidence are those of the first polygraph test given the witness or whether there have been previous tests. There is some reason to believe that reliability diminishes with later tests. Finally, I would be much more inclined to uphold receiving in evidence the results of a test which representatives of the adverse party had been permitted to observe.[2]

Although I am persuaded that a military judge should be allowed some discretion to admit polygraph results, I would not be equally liberal where "human lie detectors" are involved. Although a qualified expert may be allowed to testify that it is unlikely that a class of witnesses—such as children or rape victims—would give a false account of certain events, even an "expert" should not be allowed to testify that another witness has lied or told the truth. *United States v. Snipes*, 18 M.J. 172, 180 (C.M.A. 1984) (Everett, C.J., concurring in the result); *United States v. Moore*, 15 M.J. 354, 367 (C.M.A. 1983) (Everett, C.J., dissenting).

SULLIVAN, Judge (dissenting):

Despite the scholarly opinion of Judge Cox and the perceptive comments of Chief Judge Everett, I must dissent. The broad issue they address obscures the particular issue before us on this appeal. It is:

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN NOT ALLOWING THE DEFENSE AN OPPORTUNITY TO LAY A PROPER FOUNDATION FOR THE ADMISSION OF THE RESULTS OF APPELLANT'S POLYGRAPH EXAMINATION INTO EVIDENCE.

The military judge did not broadly hold that the results of a favorable defense polygraph examination were *per se* inadmissible at court-martial. Instead, he ruled that *neither the defense nor the prosecution* would be permitted to lay a foundation for the admission of such evidence *at appellant's trial.*

Obviously, the military judge had misgivings about the reliability of this evidence, misgivings which I share along with other federal courts. *See Brown v. Darcy*, 783 F. 2d 1389, 1394–95 (9th Cir. 1986); *United States v. Downing*, 753 F.2d 1224, 1239 n.20 (3d Cir. 1985). However, his ruling *

---

1. For example, in *Cooke v. Orser*, 12 M.J. 335 (C.M.A. 1982), intelligence agencies obviously relied heavily on lie-detector tests which corroborated the statements of the accused espionage agent.

2. In this regard, I find an analogy to the cases where, to assure fairness and accuracy, the Supreme Court required that suspects be provided lawyers to observe lineups. *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

* MJ: Well, let me say this, with respect to—I'm not going to admit this evidence on either side of the question. As far as this court is concerned, this field has not been developed that well, or accepted that well [i]n the scientific community or the judicial community for that matter, to be admissible, and it, more or less, takes that function from the fact finder, especially in light of the fact we have a defense, apparent[ly] exculpatory—a so called exculpatory examination, and one by the government which is, more or less, inculpatory. And I'm just not inclined to admit this on either side of the question, so I'm going to deny your motion

turned on the fact that trial counsel intended to evidence a second polygraph examination conducted by the Naval Investigative Service which concluded appellant was deceptive concerning his involvement with drugs on board ship. See Mil. R. Evid. 104(a), Manual for Courts-Martial, United States, 1969 (Revised edition). The potential for confusion in such a battle of polygraphers is great and, accordingly, his pre-emptive strike, as authorized by Mil. R. Evid. 403, was justified. I find no abuse of discretion in this case.

for appropriate relief in that regard. I will not allow the government to either lay a foundation—the defense to lay a foundation or to admit the evidence with respect to the polygraph examination, and that goes for the government as well, of course.

DC: Your Honor, if I could just make one point

MJ: Yes?

DC: The polygraph that Mr. Triplett of NIS gave, the few questions that he asked were much more general in nature, covered, not necessarily the same even—a period much greater than the period of charged conduct. He just asked him if you ever possessed or have you ever sold LSD on board USS INDEPENDENCE? The questions that Mr. Farr asked were very specific to that particular date that the offenses there charged—

MJ: I understand what you are saying. I don't think that—

DC: Yes, sir.

MJ: —that would not change my view of the matter in any event.