# UNITED STATES

### v.

**Airman First Class David L. POPE, FR 466–53–9543, United States Air Force.**

### ACM 28032.

U.S. Air Force Court of Military Review.

Sentence Adjudged 16 June 1989.

Decided 11 June 1990.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain Michael D. Burt.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Major Terry M. Petrie and Captain Morris D. Davis.

Before HODGSON, SPILLMAN and PRATT, Appellate Military Judges.

## DECISION

PRATT, Judge.

Polygraph evidence—to admit or not to admit; that is the question which faced the trial judge in this general court-martial which was tried before a panel of court members. The appellant, in the course of contesting a charge of cocaine use, sought admission of the exculpatory results of a polygraph examination. The military judge ruled against their admission. On appeal, appellant claims that this ruling constituted error. Under the circumstances of this case, we disagree.

Appellant submitted a urine sample as part of the Air Force's random urinalysis program. Three weeks later, a laboratory report was returned identifying his urine sample as positive for the presence of the cocaine metabolite. As a result, he was summoned to the local Office of Special Investigations (OSI) and interviewed concerning his apparent drug use. He cooperated fully with the OSI, denying any involvement with drugs and consenting to a search of his house, his car, another urine sample and a blood sample. Although the blood was never forwarded for testing, the other searches were conducted and failed to disclose the presence of drugs or drug paraphernalia.

On the basis of the initial positive urinalysis, a single charge of cocaine use was preferred. The appellant secured civilian counsel who, in turn, arranged for a private polygraph examination. The polygraph examiner conducted the test and opined that the appellant was being truthful in his denial of cocaine use. A week later, the appellant submitted to an OSI polygraph exam with opposite results.

At trial, the prosecution presented chain of custody witnesses, a toxicology expert, and the laboratory documentation reflecting the positive test results on the appellant's urine. The defense sought to admit, through the testimony of the private polygraph examiner, the exculpatory results of appellant's initial polygraph exam. At an Article 39(a), 10 U.S.C. § 839(a) session called for that purpose, the defense was afforded the opportunity to lay a foundation for the admission of the test results. Toward this end, the defense presented the testimony of the private polygraph examiner. After establishing the examiner's expertise [1], the defense elicited testimony concerning how he determined the appellant's suitability for polygraph testing, how he developed the questions to be asked on the exam, his use of something he referred to simply as "the Baxter" [2] which he described as a "standard procedure" accepted in the polygraph field and taught at the Federal School of Polygraph, the questions and answers generated during the exam, and his opinion that the appellant was being truthful in answering the relevant questions.

Through cross-examination of the defense expert, and the testimony of a government rebuttal expert, the prosecutor attacked the reliability of nearly every aspect of the polygraph examination. He highlighted inadequate steps to determine whether the appellant was a physically and medicinally suitable examinee, incomplete knowledge of the circumstances surrounding the allegations against appellant, significant flaws in the critical formulation of "control" and "relevant" questions for the exam, insufficient quality control of testing procedures and results, commercial incentive to produce favorable results, and the impact of the "friendly examiner" syndrome. [3]

Other than the reference to "the Baxter" and some discussion concerning the interrelationship of "control" and "relevant" questions, the defense did not, through the polygraph examiner or otherwise, address the workings of the polygraph instrument, the specific scientific principles involved, or the degree of acceptability of those principles in the scientific community.

After hearing argument from each counsel, the trial judge ruled that she would not

---

1. The examiner was a 1973 graduate of the Federal School of Polygraph in Fort Gordon, Georgia, with 10 subsequent years of experience as a polygraph examiner for the Army Criminal Investigations Division (CID), followed by six years as an examiner for the Fort Worth, Texas, Police Department. In his off-duty time, he works with a private polygraph service. It was in this private capacity that he was hired to examine the appellant.

2. This appears to be a reference to a technique of question formulation.

3. The "friendly examiner" syndrome refers to the concern expressed by many experts that the validity of polygraph results can be significantly undermined by the examinee's knowledge that the examiner is "friendly", i.e., that the results will not be reported other than to the examinee and/or his attorney. This "friendly" setting is said to remove the fear of detection which is a vital component of the theory underlying effective polygraph testing.

allow either the defense or the government polygraph evidence to come before the court members. As a result of this ruling, the defense case was limited to testimony by the appellant, his father-in-law, and several supervisors/co-workers. The court members found the appellant guilty and subsequently sentenced him to a bad conduct discharge, confinement for one year, forfeiture of $300 pay per month for one year, and reduction to airman basic.

## I

In 1923, the case of *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), established the standard of admissibility for all emerging scientific evidence, holding that in addition to the traditional rules of relevancy and helpfulness to the trier of fact, the area of specialty must have achieved general acceptance in the scientific community. For the following half century, this standard acted as a complete bar to the admissibility of polygraph evidence in both state and federal courts. *United States v. Piccinonna,* 885 F.2d 1529, 1531 n. 4 (11th Cir.1989) (contains excellent discussion of, and citations concerning, the various aspects of polygraph theory and admissibility). The military's adherence to the *Frye* standard led to the same result in courts-martial and, as late as the 1969 Manual For Courts–Martial, polygraph evidence was specifically cited as inadmissible. MCM, 1969 (Rev.), paragraph 142e.

The Court of Military Appeals reevaluated this issue in *United States v. Gipson,* 24 M.J. 246 (C.M.A.1987). Citing increasing criticism of the *Frye* standard, as well as the notable absence of any reference to it in either the Federal or Military Rules of Evidence, or by the drafters thereof, the Court of Military Appeals joined a growing number of federal courts in rejecting the *Frye* standard as "an independent controlling standard of admissibility" for scientific evidence. *See United States v. Downing,* 753 F.2d 1224 (3rd Cir.1985). Having thus removed the traditional bar to polygraph evidence, the Court in *Gipson* further concluded that a party must at least be given the opportunity to lay a proper foundation for the admission of polygraph evidence.

In the case presently before us, the trial judge gave appellant's counsel the opportunity to lay a foundation for the admission of the exculpatory polygraph results. Thus, there is no dispute that she complied with the mandate of *Gipson.* What is in dispute is her decision, having received the foundation, to deny admission of the results.

The *Gipson* decision does not make polygraph evidence *per se* admissible, but rather establishes that it is not *per se* inadmissible. *United States v. West,* 27 M.J. 223 (C.M.A.1988). Instead, it must now be evaluated under the entire spectrum of evidentiary rules. *Id.* at 225. Typically, this means that trial judges must assess:

(1) relevance under Mil.R.Evid. 401,

(2) helpfulness to the trier of fact under Mil.R.Evid. 702, and

(3) probative value under Mil.R.Evid. 403.

*See United States v. Abeyta,* 25 M.J. 97 (C.M.A.1987). Have we, then, done away with *Frye* altogether, i.e., has the degree of acceptance in the scientific community become irrelevant on the issue of admissibility? No. Although *Frye* is no longer *the* test for the admissibility of scientific evidence, acceptance in the scientific community remains an important factor:

What tools may the judge use in evaluating probativeness and helpfulness? Ironically, one of the most useful tools is that very degree of acceptance in the scientific community we just rejected as the be-all-end-all standard. [citation omitted] The point is, general acceptance is a factor that may or may not persuade; it is not the test. Other factors may now be equally persuasive. [citation omitted]

*Gipson,* 24 M.J. at 252. Chief Judge Everett, in a concurring opinion, reiterated the point. Referring to this new stance as a "slight relaxation" of the *Frye* test, he explained:

In determining admissibility of polygraph evidence the judge should heed carefully the principal opinion's observation that

"one of the most useful tools is" the "degree of acceptance in the scientific community." 24 M.J. at 252. At the very least, the expert witness should be able to relate his theories to scientific principles having a substantial body of adherents.

*Id.* at 255. *See also United States v. Mance,* 26 M.J. 244, 248 (C.M.A.1988).

▮ Scientific acceptability continues to be a pertinent factor because the Court recognizes that the application of R.C.M.s 401, 403, and 702, taken together, implicitly involves a determination of some degree of reliability. *Gipson,* 24 M.J. at 251; *Downing,* 753 F.2d at 1238. In other words, the reliability of evidence will necessarily play a distinct role in any assessment of its relevance and its helpfulness to the trier of fact, as well as in the weighing of its probative value versus the danger of unfair prejudice, confusion, undue delay, etc. And clearly, reliability is not limited to the acceptability of the underlying scientific principles, but also extends to the specific application of those principles in the case at hand and to any other external factors which may impact upon the ultimate "evidence" produced by the testing method. This is particularly true in the area of polygraph evidence where, in addition to definable underlying scientific principles, so many variables affecting reliability are at play in the testing process itself and in the interpretation of mechanically-produced physiological responses, e.g., the quality of the polygraph instrument, the interpretive skills of the examiner, the formulation of proper questions, the setting and tenor of the examination, the natural variations between individuals in their physiological responses, and the potential for "masking" physiological responses through medication and various other techniques. *See United States v. Williams,* 583 F.2d 1194, 1199 n. 9 (2nd Cir.1978).

▮ In recognition of the inherent difficulty in assessing such things as reliability, relevance, helpfulness, and probativeness, trial judges are uniformly afforded "considerable room to exercise 'judgement'." *Gipson,* 24 M.J. at 251. Their decisions will

not be disturbed in the absence of a clear abuse of discretion. *United States v. Jensen,* 25 M.J. 284 (C.M.A.1987); *United States v. Smith,* 869 F.2d 348 (7th Cir. 1989); *United States v. Piccinonna, supra; United States v. Downing, supra; United States v. Polizzi,* 801 F.2d 1543 (9th Cir.1986); *United States v. Williams,* 737 F.2d 594 (7th Cir.1984) ("Because this evidentiary question turns on a complex and imprecise balancing of factors [citation omitted], an appellant's burden is heavy to convince us that a reversible error occurred.")

We realize that the difficulty in this area will be in distinguishing between (1) those cases where the foundation is inadequate to justify admission of the polygraph results and (2) those cases where the foundation is at least minimally adequate to justify admission and allow any alleged inadequacies in the process, going to the weight of the evidence, to be attacked by cross-examination or other recognized means. This, of course, is part and parcel of the trial judge's recognized discretion in applying the applicable rules of evidence to the factual predicate of a particular case. In this regard, however, trial judges should note the Court's recognition in *Gipson* that "the thrust of the new rules is to make more expert testimony available to the factfinder than previously." *Gipson,* 24 M.J. at 251.

▮ In this case, the trial judge heard the foundation presented by the defense and found it inadequate. In her essential findings, the trial judge set forth the substance of the foundation provided by the defense as well as the factors on which the prosecution relied in arguing against admissibility. Specifically as regards scientific acceptability, she stated:

> I note that the defense has offered no evidence whatsoever as to how the theory of the polygraph procedure related to scientific principles having a substantial body of adherents. Accordingly, I am unable to determine whether polygraph evidence is of a type generally accepted in the scientific community.

If this were the sole basis for the trial judge's decision to deny admission of the polygraph evidence, we would be facing an entirely different question. As it is, it is apparent that this was only one of a number of factors which she considered in arriving at her ruling. The final paragraph of her essential findings provides a summary of the factors which formed the basis of her decision:

> Accordingly, in light of the controversy regarding the validity of the test results, the *ex parte* nature of the test, the lack of stipulations by the parties as to the test results, the lack of independent quality control, the absence of fear of detection on the part of the accused, and the dearth of evidence as to the acceptance of polygraph evidence in the scientific community, I will not admit the proffered defense polygraph evidence.

Based upon our own reading of the record, we find that the trial judge, in affording the proponent an opportunity to lay a foundation for the admission of the exculpatory polygraph results, met fully the mandate of *Gipson*. We further find that her decision to deny admission of the test results under the circumstances of this case, based as it was on consideration of various appropriate factors, represented a proper exercise of her judgment and discretion under Military Rules of Evidence 401, 403 and 702.

## II

■ Our attention is invited to the trial judge's failure to advise the appellant of his post-trial and appellate rights as required by R.C.M. 1010. In this case, the judge merely asked the trial defense counsel if he had advised the appellant of those rights and asked the appellant if he had any questions concerning them. We find technical error but no prejudice. *United States v. Carver*, 29 M.J. 568 (A.F.C.M.R. 1989).

Based on the analysis hereinabove, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Ac-

cordingly, the findings of guilty and the sentence are

AFFIRMED.

Judge SPILLMAN concurs.

Chief Judge HODGSON (dubitante):

The Court of Military Appeals held in *United States v. Gipson*, 24 M.J. 246 (C.M.A.1987), that the results of an exculpatory polygraph examination may be admissible in a court-martial if the accused has laid the proper foundational predicate. Here the trial judge apparently accepted the witness's expertise as a polygraph examiner, but rejected his conclusion as to the appellant's truthfulness because she was "unable to determine whether polygraph evidence is of a type generally accepted in the scientific community." While other grounds were stated in her essential findings, the lack of general acceptance in the scientific community appeared to be the major basis for not admitting the evidence.

In establishing the admissibility of novel scientific evidence under Fed.R.Evid. 702 and its offspring Mil.R.Evid. 702, a number of appellate courts have focused on reliability as a crucial element of admissibility. *See United States v. Downing*, 753 F.2d 1224 (3d Cir.1985) and cases cited therein. Unlike the standard announced in *Frye v. United States*, 293 Fed. 1013 (D.C.Cir. 1923), the reliability assessment does not require acceptance by a particular scientific discipline. Where a novel form of scientific expertise has no track record, the court may look to other factors bearing on the reliability of the evidence. One of these is its relationship to other established modes of scientific analysis; another is the existence of specialized literature dealing with the technique. As to the first factor, polygraph machines are designed to measure several involuntary physiological responses, such as respiration, galvanic responses, blood pressure, and pulse rate. *See Gipson* at 248. Each of these measurements have an undisputed, recognized scientific basis. As to the second factor, the APPENDIX to Judge Cox's opinion in *Gipson* contains a partial list of articles and treatises on polygraph testing. Thus, the scien-

tific basis of the technique has been exposed to critical debate and scrutiny. *United States v. Downing, supra.*

During the almost 60 years since the *Frye* decision, there have been substantial advances in polygraph instrumentation and technique. Better equipment is being used by better trained polygraph examiners, and polygraph tests are used extensively by government agencies in their field investigations. Further, a growing number of federal and state courts permit admission of polygraph evidence even in the absence of a stipulation. *See United States v. Piccinonna,* 885 F.2d 1529 (11th Cir.1989) and cases cited therein.

As Judge Cox stated in *Gipson* at page 253:

> In our assessment, the state of the polygraph technique is such that, depending on the competence of the examiner, the suitability of the examinee, the nature of the particular testing process employed, and such other factors as may arise, the results of a particular examination may be as good as or better than a good deal of expert and lay evidence that is routinely and uncritically received in criminal trials.

I read *Gipson* as heralding a new era regarding the admissibility of polygraph test results in courts-martial. It is clear to me that the Court of Military Appeals, at the present time, considers such evidence to possess sufficient scientific reliability to warrant admission. In my view the appellant laid the proper foundational predicate to justify admitting the exculpatory results of the polygraph test. Accordingly, I conclude the trial judge abused her discretion in suppressing the test results.

Chief Judge HODGSON participated in the decision of this case prior to his retirement on 31 May 1990.