UNITED STATES, Appellee,

v.

Master Sergeant Jose C. RODRIGUEZ,
571–76–0727, United States Army,
Appellant.

ACMR 9000201.

U.S. Army Court of Military Review.

31 Dec. 1991.

For Appellant: Captain Gregory A.
Gross, JAGC (argued), Captain Teresa L.
Norris, JAGC, Captain Timothy M. Lawlor,
JAGC, Major Michael J. Kelleher, JAGC
(on brief).

For Appellee: Major Thomas E. Booth,
JAGC (argued), Major Maria C. Fernandez,
JAGC, Lieutenant Colonel Daniel J.
Dell'Orto, JAGC, Colonel Alfred F. Arquil-
la, JAGC (on brief).

Before JOHNSON, WERNER and
GRAVELLE, Appellate Military Judges.

OPINION OF THE COURT

WERNER, Judge:

Contrary to his pleas, the appellant was
convicted by a general court-martial com-
posed of members of wrongfully using co-
caine in violation of Article 112a, Uniform
Code of Military Justice, 10 U.S.C. § 912a
(1982). His sentence to a bad-conduct dis-
charge and reduction to Private E1 was
approved by the convening authority.

The appellant contends that the military judge erred to his prejudice by permitting a government polygraph examiner to testify, over appellant's objection, that a polygraph examination indicated that the appellant was untruthful when he denied using cocaine as alleged in the charge. We hold that the judge's determination to admit the results of the polygraph was a proper exercise of judicial discretion.[1]

## I.

The appellant is a senior noncommissioned officer with nearly twenty years of active military service. On 25 July 1989, while serving in Panama, he submitted a urine sample to military authorities during an unannounced urine inspection of members of his unit conducted under the provisions of Manual for Courts–Martial, United States, 1984, Mil.R.Evid. 313(b) [hereinafter Mil.R.Evid.]. The ensuing urinalysis at an Army forensic toxicology laboratory revealed the presence of cocaine metabolites and led to appellant being charged with wrongful use of cocaine. Upon being informed of the charges and after consulting with his defense counsel, the appellant requested a polygraph examination from criminal investigators in an effort to exonerate himself. The examination, which was administered on 26 September 1989, indicated that the appellant was untruthful when he denied committing the offense.

The issue was litigated at a pretrial session wherein the government moved, *in limine*, to admit the results of the polygraph examination pursuant to Mil.R.Evid. 702. In attempting to lay a foundation in support of its motion, the government employed the testimony of Special Agent Widup, a qualified Army criminal investigator who administered the polygraph examination to the appellant. The appellant opposed the government's motion on grounds that the government did not demonstrate that the polygraph examination in question was reliable, relevant, and helpful to the

trier of fact. He argued that the government had not shown that the results of the polygraph examination were sufficiently probative so as to outweigh the prejudicial impact they would have by misleading and confusing the court members.

Mr. Widup testified about the scientific principles underlying the operation of the polygraph, the reliability of polygraph evidence in general, the policies and procedures employed by the Army governing the administering of polygraph examinations, the manner in which he conducted the polygraph examination to the appellant on 26 September 1989, and the results of that examination.

According to Mr. Widup, the fundamental operational rationale for the polygraph posits that an examinee's fear of detection in a lie will trigger involuntary physiological reactions when he responds untruthfully to the examiner's questions. He cited three studies attesting to the reliability of polygraph examinations in detecting when an examinee was being deceptive in responding to questions. He described the polygraph as an electronic instrument comprised of four components: the nomograph chest assembly which measures inhalation/exhalation ratio; the galvanic skin response [graph] which measures skin resistance and perspiration changes; the cardiosimulgraph which measures blood pressure and pulse rate; and the kimograph, which is "nothing more than a chart motor which moves the chart paper at a steady rate" to permit recordation of the examinee's reactions. The examiner asks three types of questions, relevant, control and irrelevant, designed to elicit measurable physiological responses. Relevant questions deal with the specific incident under investigation; control questions involve matters similar to that being investigated but different in time or category; irrelevant questions are unrelated to the incident under investigation. Using his expertise, the examiner

---

1. We note that the Manual for Courts–Martial, United States, 1984, was amended by Executive Order No. 12,767, (effective date 6 July 1991) with the promulgation of Mil.R.Evid. 707 which provides that results of polygraph examinations

are inadmissible in courts-martial in which arraignment has been completed on or after July 6, 1991. This amendment is inapplicable to the instant case since the appellant was arraigned on 2 December 1989.

determines from the graphic record of the examinee's responses whether he is being truthful or deceptive.

Mr. Widup explained that the Department of Defense has employed polygraphs since 1947 and has maintained records to evaluate their accuracy since 1968. Since then, the Army has conducted over 60,000 polygraph examinations of which only thirteen falsely demonstrated that the examinee was being untruthful. More recent studies have indicated there is a greater likelihood that a polygraph examination will falsely show that an examinee was truthful.

Prior to administering the polygraph examination to the appellant, Mr. Widup called the appellant's defense counsel, read the examination questions to him, and ascertained that he did not object to their use. In accordance with established investigative procedures, he insured that the instrument had been calibrated within the twenty-four hours preceding the examination. Prior to initiating the examination on 26 September, Mr. Widup informed the appellant of his rights under Article 31, UCMJ, 10 U.S.C. § 831, and that the examination was being observed by another criminal investigator through a two-way mirror. The appellant waived his rights and agreed to take the examination. For the next forty to fifty minutes, Mr. Widup interviewed the appellant "to ascertain his mental and physical state," explained the nature of the polygraph components to him, and reviewed each of the ten test questions with him to insure that he understood them. On the basis of the interview, Mr. Widup believed that the appellant was "mentally alert, physically capable of undergoing the examination, was not under any type of prescription medication, and was in overall good health."

Mr. Widup stated that during the pre-examination interview, the appellant stated that a few days prior to the urinalysis, he had "visited an off post—drinking establishment and there had consumed some alcoholic beverages and purchased some cigarettes, and he believed ... that it was at that particular establishment where he may

have unknowingly consumed either through the liquor and or the cigarettes the cocaine which caused the positive urinalysis result."

The actual polygraph examination consisted of Mr. Widup asking and the appellant answering the ten questions discussed by them during the pre-examination interview. This was accomplished several times. Mr. Widup concluded that the physiological responses reflected on the chart paper indicated that the appellant was being untruthful when he gave negative answers to the following questions: "Did you knowingly possess any cocaine within 30 days of that urinalysis? Did you knowingly use any cocaine within 30 days of that urinalysis? Are you lying about receiving advance knowledge of that urinalysis? Did you knowingly ingest any cocaine in any manner within 30 days of that urinalysis?" Subsequently, the polygraph examination results were reviewed by "quality control" personnel at the Crime Records Center in Baltimore, Maryland who concurred with Mr. Widup's opinion.

In granting the government's motion, the military judge announced:

This is a tough one folks. For so long we've kept polygraph out because we felt that it would overwhelm the court, however, in this instance I think that the testimony has probative value, should the—the conditions upon which the government would use it arise, so if the—if those conditions do arise I'm going to allow the government to present the polygraph testimony to assist the trier of fact to determine the credibility of the accused under those circumstances. In allowing this polygraph in, I am convinced of the soundness and reliability of the process and technique used in forming the polygrapher's opinion in this case. I do not think that the evidence will overwhelm or confuse or mislead the jury, and I believe that if presented it will help them to determine the credibility of the—of the accused under the circumstances.

During the trial on the merits, Mr. Widup's testimony was essentially the same as

that during the pretrial motion proceeding. Prior to findings, the military judge instructed the court members as follows:

> You have also heard the testimony of Special Agent Widup concerning polygraph examinations. He too has been accepted by me as an expert witness because his knowledge, skill, training, or education which may assist you in understanding the evidence or in determining a fact in issue. Again, you are not required to accept the testimony of any expert witness or give it more weight than the testimony of any other witness. You should, however, consider the qualifications of this expert witness. Further, you must consider the sole purpose for which the polygraph evidence was introduced and that is to assist you in evaluating the credibility of the court— of the accused's in court testimony. This evidence was introduced for whatever tendency it may have to rebut the accused's testimony that he never knowingly ingested cocaine, which would, of course, include a denial that he knowingly ingested it during the period charged. Polygraph examinations have historically been viewed with great scepticism [sic] and you should examine this evidence very critically. You have heard the testimony of Mr. Widup as to how the test was conducted and the theory of how a polygraph operates. The weight to be given to this evidence, if any, is solely within you discretion. You should assess the theory of physiological responses upon which the polygraph analysis is based along with all the other evidence that Mr. Widup provided. Now, the polygraph has been commonly and incorrectly referred to as a lie detector. At best, and you don't have to consider this to be true, but at best it is capable of measuring physiological responses at a particular point in time. Further, in evaluating this evidence you should consider the fact that you have had the opportunity to observe the accused and his demeanor in court, while you were not present and did not have the opportunity to observe the polygraph examination.

## II.

█ Prior to 1987, the results of polygraph examinations were *per se* inadmissible at courts-martial. *United States v. Ledlow,* 29 C.M.R. 475 (C.M.A.1960). However, in *United States v. Gipson,* 24 M.J. 246 (C.M.A.1987) the court held that Gipson was entitled to attempt to lay a foundation for the admission of the results of a polygraph examination which indicated he was truthful in denying commission of the charged offenses.[2] As Chief Judge Everett pointed out in his concurring opinion, the majority opinion "seeks to provide a military judge some discretion to admit evidence that might be excluded under a mechanical application of the test announced in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)." Hence, while polygraph examination results are not *per se* inadmissible, neither are they *per se* admissible. "Rather, polygraph results must be evaluated under the entire spectrum of evidentiary rules." *United States v. West,* 27 M.J. 223, 225 (C.M.A.1988); *see also United States v. Abeyta,* 25 M.J. 97 (C.M.A. 1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *United States v. McKinnie,* 29 M.J. 825 (A.C.M.R.1989), *aff'd,* 32 M.J. 141 (C.M.A.1991); *United States v. Pope,* 30 M.J. 1188 (A.F.C.M.R. 1990), *review denied,* 32 M.J. 249 (C.M.A. 1990).

The court's opinion does not restrict use of polygraph evidence to exculpatory statements proffered by the defense.

> This is not to suggest that admissibility of polygraph evidence is a one-way street. If polygraph evidence can be relevant and helpful for the defense, it can be for the prosecution as well. Argu-

---

**2.** Judge Cox, writing for the majority of the court, opined that:

> depending on the competence of the examiner, the suitability of the examinee, the nature of the particular testing process employed, and such other factors as may arise, the re-

sults of a particular examination may be as good as or better than a good deal of expert and lay evidence that is routinely and uncritically received in criminal trials.

*Gipson,* 24 M.J. at 253.

ably, as indicated, there may be a rational basis for distinguishing between positive and negative results. But if negative defense results can be admissible, negative government results can be too. *Gipson*, 24 M.J. at 252.

In accordance with the principles of *Gipson*, this court has ruled that the propriety of a military judge's determination to admit the results of a polygraph examination turns on "whether the evidence is relevant under Mil.R.Evid. 401 and 402, whether the evidence is helpful to the factfinder within the meaning of Mil.R.Evid. 702, and whether its probative value outweighs collateral dangers in accordance with Mil.R.Evid. 403." *McKinnie*, 29 M.J. at 825. In *McKinnie*, the court upheld the military judge's decision not to admit a defense-proffered, exculpatory polygraph examination on grounds that the defense had not met its burden of showing that the test was reliably administered. The instant case presents us with another opportunity to apply *Gipson*. Here, however, the results of the polygraph examination were proffered by the government in rebuttal to the appellant's denial of cocaine use during his testimony-in-chief and tend to inculpate the appellant.

### III.

■ We are satisfied that, in admitting the results of the polygraph examination of 26 September, the military judge properly employed the criteria set forth in *United States v. Gipson* and *United States v. McKinnie*. First, we find that the polygraph examination results were relevant. Polygraph examination results are relevant only if they have the "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable." Mil.R.Evid. 401. When a polygraph examination of an accused indicates that the accused has falsely denied committing a crime, it implies, to a certain extent, that he or she committed the crime (either because it suggests a guilty motive or a general propensity to lie). The Court of Military Appeals has rejected use of polygraph examinations

to establish the accused's guilt in this manner since, among other things, it usurps the role of the factfinder. *Gipson*, 24 M.J. at 252–53; *see* Mil.R.Evid. 707, analysis. However, where an accused testifies that he did not commit the offense, he places his credibility in issue. A polygraph examination that exposes an accused's earlier denial of guilt as false also lessens the probability his in-court testimony was truthful, thereby making it relevant.

■ Secondly, we find ample justification for the trial judge's finding that Mr. Widup's testimony was helpful within the meaning of Mil.R.Evid. 702. There was no question of Mr. Widup's qualifications either as an expert witness or as a polygrapher. His testimony meticulously explained the scientific principles underlying the polygraph, the methodology generally employed in testing, its acceptance in the scientific community, and the statistical record of the polygraph's accuracy. Moreover, his description of how he administered the examination to the appellant and his opinion as to the appellant's suitability as an examinee were rational, understandable, and believable. We are convinced that the judge properly concluded that Mr. Widup's testimony would assist the court members in their deliberations.

■ We also agree with the military judge's determination that the polygraph evidence was more probative than prejudicial to the rights of the appellant. Our decision, like that of the military judge, has, in part, been influenced by the factors previously enumerated herein. We have also considered that the appellant's counsel reviewed the questions subsequently posed to the appellant during the polygraph examination and had no objection to them. Also, the appellant's incriminating urinalysis was significant evidence, other than the polygraph examination, probative of his guilt. Finally, the military judge's instructions were sufficiently comprehensive and cautionary so as to eliminate any possibility of the court members being confused, misled or unduly influenced by the results of the polygraph examination. On balance,

the requirements of Mil.R.Evid. 403 have been met.

We have considered the issues personally raised by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge JOHNSON and Judge GRAVELLE concur.