UNITED STATES, Appellee,

v.

Brenda J. HILL–DUNNING, Staff
Sergeant U.S. Air Force,
Appellant.

No. 57,019.
ACM 25508.

U.S. Court of Military Appeals.

Aug. 1, 1988.

For Appellant: *Captain Lynne H. Wetzell* (argued); *Colonel Leo L. Sergi* (on brief); *Captain Charles L. Wille.*

For Appellee: *Major Carole W. Hanson* (argued); *Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni* (on brief); *Captain Jeffrey H. Curtis.*

*Opinion Of The Court*

COX, Judge:

Appellant was tried by a general court-martial made up of officer members at Columbus Air Force Base, Mississippi. She was charged with two specifications of signing a false official statement and one specification of larceny, in violation of Articles 107 and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 907 and 921, respectively. Contrary to her pleas, she was found guilty of all charges and specifications, and was sentenced to a dishonorable

discharge, confinement for 2 years, total forfeitures, a fine of $10,000.00, and reduction to the grade of airman basic. The convening authority approved the sentence as adjudged, and the Court of Military Review affirmed in an unpublished opinion. Appellant now asks us to determine whether "the military judge abuse[d] his discretion by refusing to permit a defense expert witness to testify as to the ultimate issue in the case."

Subsequent to her divorce, appellant applied for and received basic housing allowances at the "with dependent" rate, as if she were still married. At trial, the defense conceded that appellant was not married at the time of the offenses, but presented a "mistake of fact"[1] defense to the charges. Specifically, the defense argued that appellant suffered from a mental condition whereby she unconsciously suppressed or denied the fact that she was no longer married. To that end, defense counsel offered the testimony of an expert witness, Dr. Carmen Federowich, a psychiatrist who had examined appellant concerning this court-martial.

At an Article 39(a) session[2] held prior to her testimony, Dr. Federowich related to the court her professional qualifications and her post-examination diagnosis of appellant. Dr. Federowich was prepared to testify that, at the time of the offenses, appellant was engaging in a coping mechanism which caused confused thinking during times of stress. Further, appellant's mental condition caused unconscious denial and repression of certain matters, and she was using these mechanisms to reject or sublimate the fact of her divorce because it was important for her to believe she was still married.

The military judge questioned Dr. Federowich about the bases for her conclusions[3] and ruled that she could testify about the concept of repression and denial in general terms. He refused, however, to allow the witness to express her opinion as to whether or not the accused actually knew whether she was married or divorced at a certain period of time *or to express any opinion in that same regard with respect to the repression or denial.*

(Emphasis added.) It is this limitation on the expert's testimony that is the subject of this appeal.

It is apparent from this case and others we have seen recently that Mil.R.Evid. 704,[4] the so-called "ultimate issue" rule, is causing some uncertainty in its application. *Cf. United States v. Arruza,* 26 M.J. 234 (C.M.A. 1988); *United States v. White,* 25 M.J. 50 (C.M.A. 1987); *United States v. Petersen,* 24 M.J. 283 (C.M.A. 1987); *United States v. Cameron,* 21 M.J. 59 (C.M.A. 1985). It is, therefore, appropriate to revisit the rule and attempt to bring some order into its application.

First, let's look at Mil.R.Evid. 704 as it is set out in the Manual for Courts-Martial, United States, 1984.

*Rule 704. Opinion on ultimate issue*

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

█ The rule is simply stated. It's legislative history indicates that it was adopted to facilitate the basic approach to opinion evidence, whether from lay witnesses or experts. It is not, itself, a rule of inclusion. It was designed to remove bars to admission of opinions when such action would be "helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called 'ultimate issue' rule [which prevailed under common law rules of evidence] is specifically abolished by the in-

---

1. *See* para. 5–11, DA Pam. 27–9, "Military Judges' Benchbook" (C. 1) (Feb. 15, 1985).

2. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

3. *See* Appendix.

4. Manual for Courts-Martial, United States, 1984.

stant rule." Notes of Advisory Committee on Proposed Rules, 28 U.S.C.A., Federal Rules of Evidence 114. *See also* S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 698 (4th ed. 1986).

However,

[t]he abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.

J. Weinstein & M. Berger, 3 *Weinstein's Evidence* 704-4 (1987), *citing* McCormick, *Evidence* § 12 (1954). *Cf. United States v. Gipson*, 24 M.J. 246, 251 (C.M.A. 1987).

■ In summary, while the rule clearly permits "ultimate-issue" opinions from either lay or expert witnesses, it does not open the door to any and all opinions. The following analytical model might prove helpful to the bench and bar when confronted with "ultimate-issue" testimony:

a. Go back to Mil.R.Evid. 402, the basic rule for admissibility, and answer the following questions:

(1) What is the legal relevance of the evidence?

(2) What fact in controversy is being made more or less probable? and,

(3) Will the opinion be helpful to the determination of that fact? Mil.R.Evid. 702. *See United States v. Downing*, 753 F.2d 1224, 1235 (3d Cir. 1985); *United States v. Gipson, supra* at 251. Confine the expert to his or her discipline.

(4) Is there any other rule of evidence that makes the opinion inadmissible?

b. Weigh admissibility of the evidence under Mil.R.Evid. 403. If the proffered opinion satisfies these tests, it is admissible.

We have consistently held that the opinions of one witness concerning the credibility or believability of another witness are inadmissible. We do not permit witnesses to pit themselves against one another. *United States v. Arruza, United States v. White, United States v. Petersen*, and *United States v. Cameron*, all *supra*. Mil.R.Evid. 704 was not designed to bring in the "oath-helpers" referred to by McCormick, *supra*. Mil.R.Evid. 608 enumerates the method of attacking or bolstering the credibility of witnesses.

■ The problem seems to be in drawing a distinction between the expert who has an opinion based upon a belief in the truthfulness of what another person has told him and the expert whose opinion is that the other person is truthful. This, however, is a distinction which can and must be drawn and recognized. Thus, the psychiatrist who comes into court is perfectly competent to testify as to the diagnosis and indeed may testify that the diagnosis is based upon the *assumption* that what the client has said is the truth. *See* Mil.R.Evid. 705. Yet, that same witness may not testify that it is his opinion that the client is truthful, absent appropriate foundation. *See United States v. Gipson, supra.* This latter testimony is not rendered inadmissible because it embraces the "ultimate issue," *but simply because it is not relevant and helpful under the rules.* It may be very helpful for factfinders to understand the expert's opinion regarding the mental condition of a witness, the symptoms of injury or disease, and the expert's diagnosis. Indeed, it may well be relevant for the factfinders to know that the expert must necessarily believe the patient in order to formulate the diagnosis; but that does not qualify the expert to express outright the opinion that the patient indeed is "truthful." *See generally United States v. Tolppa*, 25 M.J. 352, 354-55 (C.M.A. 1987); *United States v. Azure*, 801 F.2d 336, 339-41 (8th Cir. 1986). *See also Ellis v. Jacob*, 26 M.J. 90 (C.M.A. 1988). Thus, it is not relevant or helpful for the expert to express an opinion about whether the jury should believe the witness.

In this same vein, our *Gipson* decision should not be construed as permitting a polygrapher to opine that he believes or disbelieves a witness. "At best, the expert can opine whether the examinee was being truthful or deceptive in making a particular assertion *at the time of the polygraph exam.*" *Id.* at 252–53. What the rules of evidence are trying to accomplish is to posture the expert testimony so that the factfinders can employ this expertise as a tool to evaluate the total evidence before them. The rules strive to create an environment where rational factfinders can have as much information available as is reasonably necessary to aid them in making an informed and intelligent decision.

■ Applying Mil.R.Evid. 702–705 to the facts of this case, we conclude that the military judge was too broad in his application of the rules to the testimony of Dr. Federowich. First, it is true that Dr. Federowich was being asked to express her opinion on the "ultimate issue," *i.e.*, did Sergeant Hill-Dunning unconsciously repress the fact that she was divorced? Mil. R.Evid. 704, however, does not preclude this question if the expert is competent to express such an opinion. Also, the fact that Dr. Federowich's opinion was based upon her belief in what her patient was telling her is not of moment. Indeed, in order for any expert to form an opinion, it must be predicated upon *some assumption of the truth* of underlying facts. As we read the testimony, the military judge would not permit the doctor to express her final diagnosis because it was based on the fact that she believed what appellant had told her during psychiatric counseling sessions. That simply is not the test.

The military judge was correct in ruling that Dr. Federowich could not testify that, in her opinion, appellant was being truthful. However, the doctor could have testified that her expert opinion was based upon her assumption that appellant was being truthful. Further, she could have opined that appellant's claim was consistent with her mental/emotional make-up. The relevant evidence here—the evidence

that is "helpful" to the finders of fact—is the expert's opinion about the dynamics of appellant's mental condition at the times pertinent to the alleged offenses. The fact that the doctor believed appellant may have been incidental to her expert opinion and, indeed, the basis of her opinion. However, the aim of her testimony was to inform the factfinders about a mental condition that causes unconscious "denial" and "repression" of certain matters. Put into its proper perspective, the question of appellant's credibility is left with the finders of fact where it appropriately belongs.

We do not find, however, that the military judge's ruling requires reversal of appellant's conviction. Art. 59(a), UCMJ, 10 U.S.C. § 859(a). Dr. Federowich was a well-qualified expert; she ably provided the court-martial with information concerning appellant's mental condition; and she clearly explained the mechanisms of "denial" and "repression." She further delineated not only her diagnosis, but also appellant's prior history of psychological problems. Thus, Dr. Federowich made a link between appellant's histrionic personality disorder and the unconscious mechanisms of "denial" and "repression."

These opinions could only have been reached after making a judgment about appellant's credibility: that is to say—appellant was telling the truth, as far as the witness was concerned.

Appellant testified at trial and the court members had the opportunity to judge for themselves whether she was believable. She demonstrated, through her own testimony and that given by other witnesses, that her behavior patterns were consistent with those of a married woman. Dr. Federowich was able to link these patterns to her theory that appellant's behavior was caused by "denial" and "repression" of knowledge of real facts and situations that caused her to suffer undue stress or emotional pain. Thus, we conclude that the military judge's ruling did not hamper full development of the defense theory of mistake of fact. Unfortunately for appellant, the Government offered convincing evi-

dence to the contrary, and the defense was rejected by the court members. We find no reason to disturb that verdict on appeal.

We hold that the military judge's refusal to permit the defense expert witness to testify as to the ultimate issue did not constitute reversible error.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge SULLIVAN concur.

## APPENDIX

Questions by Military Judge:

Q: Dr. Federowich, we have a concept in the law called intentional ignorance or deliberate ignorance. Are you familiar with that?

A: No.

Q: Basically that refers to what happens when someone had knowledge of a certain fact which, if it was known that they knew that, might draw some adverse legal consequences to them. In this case, do you know what the charges are against Sergeant Hill-Dunning in this case?

A: Yes.

Q: What are they?

A: That she intentionally intended to defraud the Government by claiming she was married when she was in fact divorced to, apparently, get some extra money.

Q: Well, you can appreciate then, that the job of this jury is going to be to determine, as I'm seeing it at this point, whether Sergeant Hill-Dunning was intentionally ignorant of the fact that she was divorced, which would be a conscious process, as I understand it, or did she unconsciously repress this knowledge. Now, as a psychiatrist, how would you determine it? How could you distinguish a person who was deliberately ignorant from one who was unconsciously repressing things?

A: From the interviews and my knowledge of the type of illness that she has, a review of the records, and her demeanor. I could give you an opinion on it.

Q: How would a psychiatrist go about doing that? You said you gave a MMPI. Is there a test that a psychiatrist can give to distinguish deliberate ignorance from repression?

A: There is no specific test. There's no test as to detect when someone is lying or not. You have to just form an opinion from all the information that you have.

Q: Well, I take it then, in order to come to the conclusion that Sergeant Hill-Dunning was unconsciously repressing this information, you have to make an assessment of her credibility. Is that correct?

A: Yes.

Q: So you have to be of the opinion that she's telling the truth to you when she relates this information to you?

A: Yes, Sir.

Q: Would you agree that psychiatrists are generally no better qualified than a layman who's experienced in the ways of the world in determining whether someone is being truthful or not?

A: Well, psychiatrists are more aware, I think, of mental illnesses and how these impair how a person deals with life.

Q: Yes ma'am, I understand that; but are you saying that a psychiatrist is better qualified to determine if someone is lying or telling the truth than a layman who's experienced in the ways of the world?

A: No, I'm not.

Q: You wouldn't say that?

A: (Negative response.)

Q: If I understand you correctly, then, Doctor, your diagnosis of unconscious repression is solely related to your belief that the Accused told you the truth?

A: Well, it's based, like I said, on my records, my expertise in psychiatric illnesses, and the type of disorder that she has.

Q: If I'm understanding you correctly, Doctor, then you're saying that a psychiatrist is no better qualified to distinguish intentional ignorance from unconscious repression than a layman?

A: I believe I can give you an opinion, an expert opinion, as to whether I feel she's using coping mechanisms of repression and denial.

Q: And that would be directly related to your assessment as to whether or not she's being truthful?

A: (Affirmative response.)

Q: In this case we've had evidence introduced that for a number of years, Sergeant Hill-Dunning filed income tax returns indicating that she was either single or head of household. For most of those years ... she received an income tax refund. Now, can you explain how that is consistent with your opinion that she was unconsciously repressing this divorce? In other words, what I don't understand is how someone could unconsciously repress such things, but when it comes tax time suddenly remember that they were divorced.

A: Well, she knew she wasn't living with him; she was separated. She could have considered herself single in that regard. I mean, that could be her way of thinking. I didn't ask her that question.

\* \* \* \* \* \*

Q: So, it is safe to say that you're speculating, then, as to how she might come to that conclusion?

A: Right.

Q: Wouldn't the fact that someone files tax returns, though, indicating that they're single or head of household indicate a situation whereby or argue heavily against a diagnosis of unconscious repression of this information?

A: It could.

Q: Now, Doctor, I'm obviously not an expert in these areas, but the very words "repression or denial" connote to me that one must be conscious of this threatening event in order to repress it. Is that right or wrong?

A: (No response.)

Q: At some point must a person be aware of the threat to their psyche in order to repress it?

A: Once that mechanism occurs, it's unconscious. It's out of the person's awareness. There's a difference between somebody who's saying, "I'm lying about this and I'm just saying it because it's convenient to me or whatever," and someone who actually has a belief that this is not a fact. This is the case of a person who uses repression and denial. It's not a deliberate thing.

\* \* \* \* \* \*

Q: No, I understand that; but before that subconscious or unconscious process takes over, there must be conscious fear of this situation. Is that correct?

A: Yes. At one point they're conscious of it.

Q: So, in this case, ... if she was using denial or repression, then at some point she must have been aware of the fact that she was divorced before she could repress it or deny it. Is that true?

A: Yes, that's true.

Q: Doctor, are you a member of the American Psychiatric Association?

A: Yes.

Q: Is it true that it's the position of the APA that psychiatrists are no better able to determine whether an individual is lying than the average layman?

A: Yes, that's true.

Q: Do you agree with that position or do you disagree with the APA position?

A: No, I agree with the APA.