UNITED STATES, Appellee,

v.

Private First Class Leon TARVER, 546–25–9633, United States Army, Appellant.

ACMR 8701179.

U.S. Army Court of Military Review.

26 Sept. 1989.

**606**

For Appellant: Lieutenant Colonel Joel D. Miller, JAGC, Captain Donald G. Curry, Jr., JAGC, Captain James E. O'Hare, JAGC, Captain Lauren B. Leeker, JAGC (on brief).

For Appellee: Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Captain Martin D. Carpenter, JAGC, Captain Donald W. Hitzeman, JAGC, Captain Jody M. Prescott, JAGC (on brief).

Before FOREMAN, SMITH and VARO, Appellate Military Judges.

## OPINION OF THE COURT

SMITH, Judge:

On 6 and 15 April, 4–9, 11, 14–15, and 18–21 May 1987, appellant was tried by a general court-martial composed of officer members at Fort Ord, and the Presidio of San Francisco, California. Contrary to his pleas, he was convicted of fraudulent enlistment and unpremeditated murder[1] in violation of Articles 83 and 118, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 883, 918. His sentence to a dishonorable discharge, confinement for life, total forfeitures, and reduction to Private E1 was approved by the convening authority.

On 31 December 1986, appellant, while an inpatient, was signed out from Letterman Army Medical Center's psychiatric ward and went to the Post Exchange (PX) at the Presidio of San Francisco. Upon entering the exchange, appellant approached a vendor who sold, among other items, survival knives. He purchased a hunting knife with sheath. As he left the counter toward the exit, he was called back to sign the vendor's cash sheet and was asked whether he wanted the box for the knife. Appellant replied that he did not need the box, walked toward the exit again and unsheathed the knife. Appellant encountered and stopped Lieutenant Colonel (LTC) William F. McAllister as LTC McAllister entered the PX. The two talked briefly even though they were not acquainted. Suddenly and without warning, appellant plunged his newly purchased knife deeply into LTC McAllister's stomach. The knife tore through LTC McAllister's body, severing the aorta and cutting a notch in his spine. Despite the immediate and concerted efforts of medical personnel on the scene and at the local hospital, LTC McAllister died of massive internal bleeding within minutes.

Appellant immediately fled the PX and hid in a nearby storage area. He was immediately pursued by a military policeman and a store detective and apprehended. The murder weapon was found hidden behind some barrels during a search of the area.

Appellant had enlisted in the United States Army on 17 April 1985 on false representations that (1) he had never been in any Regular or Reserve Branch of the armed services, (2) that he had never been arrested, charged or held by law enforcement authorities, and (3) that he had never been detained, held in, or served time in any jail, prison or correctional institution. The appellant had in fact: (a) been on active duty with the United States Army sometime in 1976 through 1977; (b) been arrested by law enforcement authorities on 27 August 1981 for robbery; (c) been convicted of grand theft from a person on 25 November 1981; and (d) been arrested for grand theft auto on 14 October 1981, convicted for taking a vehicle without the owner's consent on 8 December 1981, and confined for several months in the Los Angeles County jail.

During his enlistment appellant was twice hospitalized for mental/emotional dif-

---

1. Appellant was charged with premeditated murder, referred capital, in violation of Article 118(1), Uniform Code of Military Justice, but was convicted of the lesser included offense in violation of Article 118(2), Uniform Code of Military Justice.

ficulties and the defense case was based on a lack of mental responsibility, specifically, a diagnosis of schizophrenia. The trial defense counsel conceded in his opening statement that appellant had stabbed LTC McAllister but stated, "We will prove to your satisfaction that Leon Tarver was legally insane when he committed the acts of fraudulent enlistment and the stabbing on 31 December."

On appeal appellant asserts, *inter alia*, that:

THE MILITARY JUDGE ERRED BY FAILING TO INSTRUCT THE COURT MEMBERS THAT THEY COULD CONSIDER EVIDENCE OF DIMINISHED MENTAL RESPONSIBILITY ON THE ISSUE OF INTENT, AND BY ORDERING THE DEFENSE NOT TO ARGUE THAT DIMINISHED MENTAL RESPONSIBILITY COULD NEGATE INTENT.

During the trial, six psychiatrists and three psychologists testified on the issue of appellant's mental responsibility. These witnesses generally agreed that appellant suffered from schizophrenia. Three members of an Army board convened to examine appellant opined that appellant suffered from "schizophrenia, undifferential type, sub chronic an Axis I, mixed personality disorder with paranoid and antisocial features in Axis II." As to both offenses, the board members opined that appellant was able to appreciate the nature, quality, and wrongfulness of his acts. When asked to describe schizophrenia from a "layman's point of view," one of the defense called psychiatrists stated:

Schizophrenia is a—well, let me preface my comments by saying that we don't know a lot about schizophrenia. There's a lot I can't tell you, but it's generally believed to be a life long psychotic illness, probably with a heavy degree of genetic loading, even though it doesn't flower until the second or third decades of life, in which individuals episodically suffer impaired commerce with reality. They may not see or hear the same things the rest of us do, they misinterpret what is going on around them, typi-

cally in a negative way, that is they—they may see threats, assaults, or hostility when there's absolutely none. They may develope [sic] the most bizarre notions, what we call delusions, that are resistant to persuasion. They can not be talked out of it by the presentation of evidence. They are often confused and it is not only their conclusions which are unusual—unusual or delusional, but they exhibit a peculiar way of arriving at their conclusions. It's very difficult, for example, to follow their thinking. If you ask them a question that requires just a brief answer, it may be perfectly rational, but if you ask them then to explain their answer and you start getting more sentences, the sentences seem like they are from entirely disparrat [sic]—disjointed paragraphs, but each sentence may be okay, but they don't hang together, and it's very difficult to follow their train of thought. They seem to slide off one thought into another, into different directions, what we call loosening of association and transdential [sic] thinking. They present these ideas which are nutty in their own right, in a very curious way. The feelings that they exhibit, that accompany these thoughts, don't match. They may be talking about the most horrendous things, that they want to take their own life, that life is not worth living, that they are nothing but shit and they should die, and as they're telling this very sad tale, they're smiling. This is where schizophrenia comes from, a splitting between feeling and thought, or then they talk about killing dozens of others and performing a great homicidal service to this nation, and they'll talk about these things in a flat emotional, robot like tone, just the thoughts are not getting down to where their feelings are. Obviously, with these disturbed thoughts and feelings you may get some very unusual and irrational behavior. At other times, they may sit very quietly and you have really no notion of the turmoil that's going on inside their brain. These acute episodes come and go. We have many good treatments for the condition, that is we can make the symptoms go

away for a time, but as yet no cure, and as yet no real understanding of the cause of this disorder.

Asked to describe appellant's condition, the same psychiatrist stated:

His condition has been characterized by episodes of psychosis, characterized by delusional thinking, sometimes hallucinations, confusion, lack of insight, homicidal and suicidal thoughts, alternating periods where these get resubmerged and he seems to be functioning reasonably well.

The record is replete with statements by psychiatrists and psychologists called by both the defense and government indicating that appellant's mental state/thought disorder could have affected his ability to form an intent to kill or inflict grievous bodily harm or to knowingly misrepresent facts when he enlisted. Indeed the very nature of schizophrenia is an impairment of an individual's ability to correctly perceive reality.

Subsequent to the presentation of evidence by both sides, the government moved *in limine* for an order, over defense objection, to preclude the defense from arguing that àppellant's mental incapacity could negate intent even in the absence of being a complete defense of lack of mental responsibility. In support, counsel cited Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 916(k)(C3, 1 June 1987) [hereinafter M.C.M., 1984 and R.C.M.] for the proposition that partial mental responsibility was not a defense. The military judge granted the motion, ruling in essence that Congress intended in Article 50a(a), UCMJ, 10 U.S.C. § 850a(a),[2] to preclude the defense of partial mental responsibility. He furthered ruled that R.C.M. 916(k)(1) (C3, 1 June 1987) implemented that Congressional decision by specifically addressing the issue:

A mental condition not amounting to a lack of mental responsibility under subsection (k)(1) of this rule is not a defense, *nor is evidence of such a mental condi-*

*tion admissible as to whether the accused entertained a state of mind necessary to be proven as an element of the offense.*

R.C.M. 916(k)(2) (C3, 1 June 1987) (emphasis added.)

The military judge erred. Subsequent to the trial of this case this question was specifically addressed by the Court of Military Appeals in *Ellis v. Jacob*, 26 M.J. 90 (C.M.A.1988). In *Ellis* the accused was charged with unpremeditated murder and moved *in limine* for a ruling to permit him to introduce expert opinion testimony of the effect of sleep deprivation on his state of mind at the time of the offense. The evidence was intended to rebut evidence of the element of "intent to kill or inflict great bodily harm" required for a conviction of unpremeditated murder. The trial judge in that case ruled that Article 50(a), UCMJ, 10 U.S.C. § 850(a) and R.C.M. 916(k)(2) precluded the use of the evidence.

The Court of Military Appeals held that the judge erred when he excluded the evidence. *Ellis*, 26 M.J. at 91. The Court reasoned that precluding attacks on the *mens rea* elements required to be proved by the government raised both constitutional issues and issues related to the President's rule making authority but held that these issues need not be addressed because it was clear that Congress had no intention of negating *mens rea* attacks in the form of diminished mental capacity. *Id.* at 92–93.

In this case there is no question that appellant suffered from a mental disease. The question presented was twofold. First, did his mental disease amount to a complete defense of lack of mental responsibility or, if not, was his impairment of such a nature that it affected his state of mind as to the "intents" requiring proof by the government. We find that the evidence regarding this disorder was relevant, even if a complete defense of lack of mental responsibility did not exist, to the element of intent to be proved in both charged

---

**2.** Article 50a(a) provides,

"It is an affirmative defense in a trial by court-martial that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease

or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts. *Mental disease or defect does not otherwise constitute a defense.*" (emphasis added.)

offenses. It was error to preclude the argument that appellant because of his mental disease, lacked the required *mens rea.*[3] Further when the evidence establishes a mental condition which may negate an accused's ability to entertain a required *mens rea* element of an offense, the military judge must, *sua sponte* instruct.[4] *See United States v. Pohlot,* 827 F.2d 889 (3d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988).

Because of our disposition of this case, we have not considered the other errors asserted.

The findings of guilty and the sentence are set aside. A rehearing may be ordered by the same or a different convening authority.

Senior Judge FOREMAN and Judge VARO concur.

**3.** The elements of fraudulent enlistment or appointment and unpremeditated murder are:

(1) *Fraudulent enlistment or appointment.*

(a) That the accused was enlisted or appointed in an armed force;

(b) That the accused knowingly misrepresented or deliberately concealed a certain material fact or facts regarding qualifications of the accused for enlistment or appointment;

(c) That the accused's enlistment or appointment was obtained or procured by that knowingly false representation or deliberate concealment; and

(d) That under this enlistment or appointment the accused received pay or allowances or both.

M.C.M., 1984, Part IV, paragraph 7*b*(1).

(2) *Intent to kill or inflict great bodily harm.*

(a) That a certain named or described person is dead;

(b) That the death resulted from the act or omission of the accused;

(c) That the killing was unlawful; and

(d) That, at the time of the killing, the accused had the intent to kill or inflict great bodily harm upon a person.

M.C.M., 1984, Part IV, paragraph 43*b*(2).

**4.** See the instruction on partial mental responsibility in the Military Judges' Benchbook, paragraph 6–5, DA Pamphlet 27–9 (1 May 1982) (C3, 15 February 1989).