UNITED STATES, Appellee,

v.

Sergeant Charles D. TILTON, III,
568–61–0247, United States
Army, Appellant.

ACMR 9003152.

U.S. Army Court of Military Review.

30 April 1992.

For Appellant: Captain James M. Heaton, JAGC, Captain Mark L. Toole, JAGC (on brief).

For Appellee: Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Captain Timothy W. Lucas, JAGC, Captain Gregory T. Baldwin, JAGC (on brief).

Before CREAN, WERNER, and HAGAN, Appellate Military Judges.

OPINION OF THE COURT

CREAN, Senior Judge:

The appellant was found guilty, contrary to his pleas, by a general court-mar-

tial composed of enlisted members of conspiracy to rob a bank, and soliciting others to rob a bank (two specifications), in violation of Articles 81 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881 and 934 (1982) [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for three years, forfeiture of $500.00 pay per month for three years,[1] and reduction to Private E1.

The appellant was a military policeman (MP) serving in Panama. At the time of his offenses, he had served approximately five years on active duty with exemplary service. He had been selected as the United States Army South Soldier of the Year for 1988, the Military Police Command Soldier of the Month, and had won in the E–5 category of the Army-wide competition for MP Noncommissioned Officer of Excellence competition. He had received four awards of the Army Achievement Medal, an Army Commendation Medal, the Joint Service Achievement Medal, and the Good Conduct Medal, as well as other service awards. His efficiency reports, admitted at trial, were superior and character witnesses testified to his superior qualities and outstanding duty performance.

In the summer of 1990, the appellant decided to rob a local Panamanian bank. To accomplish this task, the appellant decided to solicit other soldiers to help him. The initial group of soldiers he approached declined to participate. The appellant kept looking for accomplices and finally found three other MP sergeants to be his partners. Unbeknownst to the appellant, one of the co-conspirators, Sergeant M, had immediately gone to the Criminal Investigation Command (CID) and informed them of the conspiracy. The appellant and his co-conspirators were kept under surveillance.

The plan, developed by the appellant, was to kidnap a taxi driver, go to the bank in costume, and use shotguns and 9mm pistols to commit the robbery. In furtherance of this plan, the appellant purchased the shotguns, rented the costumes, and placed the details of the plan in a notebook complete with accurate drawings of the bank floor-plan. The conspirators also made a dry-run rehearsal to include viewing the bank exterior on 21 August 1990. Final plans were completed and the actual robbery was to take place the next day.

Early in the morning of 22 August 1990, the appellant drove onto Fort Clayton to pick up his co-conspirators. He had concealed the shotguns in his truck. The CID arrested the appellant as he came to pick up Sergeant M.

The appellant testified that he was a devout Mormon who had held various positions in the Mormon priesthood. In January 1990, his wife[2] told him that she was pregnant and wanted to abort the baby. Even though he was opposed to abortion, he paid for her to have the abortion. The abortion of the child conflicted with his religious beliefs and caused him such severe emotional conflicts that he wanted to kill himself. He attempted to kill himself by firing a pistol into his mouth on 15 August 1990, a week before the apprehension by the CID. However, the weapon misfired.

The appellant further testified that he did not intend to rob the bank. He testified concerning his actual intent in the following manner:

Q. Did you actually intend to rob that bank?

A. Not to rob the bank, sir, no. I didn't intend to take any money. I intended to go to the bank but not to take any money.

Q. What did you intend to do?

A. The way I visualized it, I would go to the bank, go in the door—I don't know, either hold everyone a hostage, let

1. The forfeitures should have been expressed in terms of months rather than years. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 1003(b)(2). We will make this correction in our decretal paragraph. *See United States v. Pierce,* 25 M.J. 607 (A.C.M.R.1987), *rev'd on other grounds,* 27 M.J. 367 (C.M.A. 1989).

2. At the time, the appellant's wife was only his girlfriend. They subsequently married in a civil ceremony in May 1990 and a religious ceremony in June 1990.

some people go out—it didn't matter. Somehow or another, the police would get notified, would come to the bank, and from there, it would be very easy to force them to shoot me—to make my last stand.

After describing how he recruited the others to participate in the robbery and his plan for picking them up in his truck on the morning of the intended robbery, the appellant went on to testify:

I was going to go to the bank in the truck, tell them guys to wait in the truck until I got inside with the bank guard. Once I was inside with the bank guard, either let somebody run out or, I don't know, shoot around on the floor. Somehow, somebody would have set off the alarm. Whether they came in or not after that, I didn't think they would but I really didn't care, and go through with the plan as I had described—let the police come, surround the building, force their hand.

The defense proffered the testimony of Doctor (Dr.) Weldon, a psychiatrist at the local Army hospital who had examined appellant for a sanity board, on the appellant's intent regarding the bank robbery. At an Article 39(a), UCMJ, session, Doctor Weldon testified that it was his professional opinion the appellant did not intend to rob the bank but instead intended to commit suicide. There was a long and detailed discussion between the military judge and trial defense counsel on the admissibility of Dr. Weldon's opinion testimony on the intent of the appellant.

The military judge initially ruled that Dr. Weldon could not testify on this issue because his proffered testimony did not negate the appellant's criminal intent but went to his motive for committing the crime. After further discussion, the military judge ruled that Dr. Weldon could testify, but limited the scope of his testimony to the appellant's state of mind and his capacity to form the necessary intent. The military judge further ruled that Dr. Weldon could not testify as to appellant's be-

lievability or his opinion as to the appellant's intent during the time that the offenses were being committed. He stated that his ruling was to prevent the court members from being confused as to the *mens rea* required for the offenses. He also permitted the government to have two psychiatrists testify in rebuttal as to the appellant's ability to form intent.

The appellant contends that the military judge erred in limiting the testimony of Dr. Weldon and not permitting him to testify as to whether or not the appellant actually intended to commit the bank robbery. We disagree.

Expert opinion testimony is admissible if it will assist the trier of fact to understand the evidence or to determine a fact in issue. Manual for Courts–Martial, United States, 1984, Military Rule of Evidence 702 [hereinafter Mil.R.Evid.]. The expert opinion testimony is admissible even if it embraces an ultimate issue to be decided by the trier of fact. Mil.R.Evid. 704. The Court of Military Appeals has laid out the framework for deciding the "ultimate-issue" testimony under Mil.R.Evid. 704:

a. Go back to Mil.R.Evid. 402, the basic rule for admissibility, and answer the following questions:

(1) What is the legal relevance of the evidence?

(2) What fact in controversy is being made more or less probable? and,

(3) Will the opinion be helpful to the determination of that fact? ... Confine the expert to his or her discipline.

(4) Is there any other rule of evidence that makes the opinion inadmissible?

b. Weigh admissibility of the evidence under Mil.R.Evid. 403. If the proffered opinion satisfies these tests, it is admissible.

*United States v. Hill–Dunning*, 26 M.J. 260, 262 (C.M.A.1988) (citations omitted).

The factual circumstances of this case are not very different from the factual circumstances in the leading Federal case on the use of expert psychiatric testimony.[3]

---

**3.** The Federal Rule on the affirmative defense of insanity, 18 U.S.C. § 17, is exactly the same as

Article 50a, UCMJ, 10 U.S.C. § 850a. *See Ellis v. Jacob*, 26 M.J. 90 (C.M.A.1988); *United States*

That court held that the Federal Rule did not prohibit a defendant from introducing evidence of a mental abnormality to negate *mens rea* and disprove an element of a crime. *United States v. Pohlot*, 827 F.2d 889 (3rd Cir.1987). However, psychiatric testimony on the defendant's subconscious motivation in hiring someone to kill his wife did not demonstrate a lack of *mens rea*. As that court stated: "We often act intending to accomplish the immediate goal of our activity, while not fully appreciating the consequences of our act. But purposeful activity is all the law requires." *Pohlot*, 827 F.2d at 907.

■■■ Doctor Weldon's expert opinion testimony, in its barest form, is that the appellant desired to commit suicide rather than obtain money from the bank. The military judge correctly determined that Dr. Weldon was discussing motive rather than intent. Under the law, however, it is the intent and not the motive that determines criminality of an act. "Intention is a determination to act in a certain way; motive is that which incites and stimulates the formation of the intention. There is no distinction of greater importance in the criminal law." *United States v. Kastner*, 17 M.J. 11, 13 (C.M.A.1983) (citing Clark & Marshall, A Treatise on the Law of Crimes 263 (7th ed. 1967)). The correct test is objective, not subjective: Is the accused's conduct, objectively viewed, a violation of established law? *Kastner*, 17 M.J. at 13. The appellant engaged in purposeful activity. He solicited the assistance of the other soldiers to rob the bank. The appellant and the other individuals set up and practiced a plan on how to rob the bank. The intent of the appellant was to rob the bank. The appellant's reason for planning the robbery was to get himself killed during the robbery. This was his motive for the robbery. The military judge properly distinguished this motive from the *mens rea* of conspiracy to rob the bank.

■■■ We have also applied the analytical model Judge Cox outlined in *Hill–Dunning v. Tarver*, 29 M.J. 605 (A.C.M.R.1989); *see also United States v. Lilly*, 34 M.J. 670 (A.C.M.R.

and determined that the military judge's ruling to limit Dr. Weldon's testimony, because it went to motive and not intent, was not unduly restrictive. Appellant's suicidal motive was relevant to his state of mind and his capacity to form an intent. Limiting Dr. Weldon's testimony to state-of-mind and capacity permitted helpful expert testimony for the fact-finders on appellant's mental condition and on his ability to form an intent. Limiting the testimony as he did, the military judge minimized the confusion for the fact-finder as to the required *mens rea*. The military judge followed the same reasoning as *Pohlot* and arrived at the same conclusion. Additionally, the military judge was correct in not allowing Dr. Weldon to testify on the appellant's believability, *Hill–Dunning, supra*, at 262; and, providing his conclusory opinion of the appellant's *mens rea* or intent. Mil.R.Evid 704.

■■■ The military judge properly permitted Dr. Weldon to testify as to appellant's psychological problems. This enabled the defense to present the appellant's testimony that he wanted to commit suicide from its perspective when it argued that he did not have the requisite intent to rob. The defense was not hampered in presenting its theory by the ruling of the military judge. In fact, its theory was enhanced by the military judge's ruling since it provided the trier of fact a clear unconfused statement of the appellant's intention. It was then up to the trier of fact to determine the believability of the appellant's story.

We have carefully considered the other errors asserted by the appellant, either through counsel or personally pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them without merit.

The findings of guilty are affirmed. Only so much of the sentence as provides for a bad-conduct discharge, forfeiture of $500.00 pay per month for 36 months, con-

1992).

finement for 3 years, and reduction to Private E1 is affirmed.

Judge WERNER and Judge HAGAN concur.